# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Paul Yarolem ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 17 CV 50096 |
| ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This is a Social Security disability appeal involving an allegation of back pain. In January 2012, plaintiff, a mechanic, slipped on ice while trying to get into his truck at work. Although he injured both his left shoulder and back, his treatment for the first year focused on the shoulder problem. Eventually, after surgery, this problem was addressed such that plaintiff's surgeon, in February 2013, released him to work with no restrictions regarding his shoulder. Around this time, plaintiff began focusing on his back pain. His care was overseen by his primary doctor, Michael Rivera, who prescribed Norco and saw plaintiff on a fairly regular basis over a two-plus year period. Dr. Rivera referred plaintiff to Dr. Hwang, an orthopedist, who did not recommend surgery, but instead advised plaintiff to try physical therapy and conservative treatment. Plaintiff also saw a neurologist, but did not follow through with any treatment recommendations. Three lumbar MRIs were taken—one in March 2012, one in April 2014, and the last in November 2015. In addition to this treatment, plaintiff was evaluated by several doctors, including two State agency physicians (Drs. Andrews and Towfig), a consultative examiner (Dr.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

Ramchandani), and two "independent" consultants in connection with a parallel worker's compensation case (Drs. Fisher and Lami).

On December 17, 2015, the administrative law judge ("ALJ") held a hearing. Plaintiff, who was then 51 years old, testified that he had several injections to help with the back pain, but that they only worked for several weeks. He stated that he was taking Norco, and sometimes used ice, to treat his back pain. On a typical day, he gets out of bed, makes coffee, and lies on the couch for most of the day. R. 45. He testified that he walks for half an hour each day for exercise and is only able to stand for 15 minutes and walk approximately 80 yards. He has difficulty bending down and his mother sometimes helps him put on his socks and shoes. Also testifying at the hearing was Dr. Sai Nimmagadda. He opined that plaintiff did not meet a listing and that he had the residual functional capacity to do light work. His testimony is discussed further below.

On February 3, 2016, the ALJ issued a written decision finding plaintiff not disabled. The ALJ found that plaintiff's back problems were mild in terms of the objective evidence and that plaintiff only pursued conservative treatment. The ALJ also found that plaintiff lacked credibility based on the claim that he suffered a dramatic downturn six weeks before the hearing. As for opinion evidence, the ALJ relied on the two State agency decisions, the testimony of Dr. Nimmagadda, and the reports from the two independent consultants. The ALJ gave little weight to an opinion from Dr. Rivera, who stated that plaintiff would be limited in various ways.

**DISCUSSION**

Plaintiff raises three arguments for remand. First, the ALJ erred in relying on Dr. Nimmagadda's testimony. Second, the ALJ failed to give controlling weight to Dr. Rivera's opinion. Third, the ALJ erred in ignoring a 2015 MRI. Plaintiff's overarching thesis is that this

2

case boils down to a two-person battle of experts—Dr. Nimmagadda versus Dr. Rivera—and that the nod should have been given to Dr. Rivera because he was the treating physician.

I. **Dr. Nimmagadda.**

Plaintiff's first argument is the longest and most complex. Plaintiff digs into the hearing transcript and finds several areas where the doctor supposedly gave confusing testimony.

Plaintiff raises two preliminary, soften-the-ground arguments. First, he complains that the ALJ asked leading questions. Second, he argues that Dr. Nimmagadda was unqualified because he specialized in pediatric allergies and asthma. As for the former argument, the Court has reviewed the transcript and finds that the ALJ did ask leading questions in places. They were summaries of the evidence followed by the phrase "am I correct?" *See, e.g.*, R. 64, 65. The Court agrees that, all things considered, it would have been preferable if the ALJ had not taken such an active role, especially at the beginning of the doctor's testimony. However, on balance, the Court can find no basis for believing that this style of questioning changed the doctor's opinions. Although Dr. Nimmagadda agreed with several of the ALJ's statements, he elaborated and provided his own explanation at several points. Moreover, this Court will not lightly assume that an expert witness, such as Dr. Nimmagadda, was pressured into changing his testimony by the type of mildly-leading questions asked by the ALJ here.

As for the latter argument, plaintiff is correct that Dr. Nimmagadda was not a spinal expert, but the Court does not find that this fact means that his testimony should be ignored. Plaintiff has not cited to any authority that would preclude a doctor from testifying in a Social Security administrative hearing about medical issues outside of his specialty or practice area.[2]

---

[2] Plaintiff's counsel did not raise any objections to Dr. Nimmagadda's credentials at the time of the hearing; however, after the hearing, counsel submitted a letter raising these issues. *See* Ex. 13B (pointing out that Dr. Nimmagadda specialized in allergies and asthma, that he had no "specific training . . . in orthopedic or spinal conditions, and that "there is no indication that he has even treated an individual with a spinal conditions before").

3

Indeed, the case law is contrary. *See Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). In any event, plaintiff's main argument is that Dr. Rivera's opinion was more credible, but as plaintiff acknowledges, he also had no expertise in spinal problems. Most significantly, the primary problem with plaintiff's argument about expertise—and really with his entire case for remand—is that it glosses over the fact that the ALJ relied on *multiple* medical opinions and findings. As noted above, there were five reports from doctors assessing plaintiff's back condition and whether he was disabled. Two of the doctors were orthopedic specialists. Dr. Fischer was a Fellow of the American Academy of Orthopaedic Surgeons, and Dr. Lami was a Board Certified Orthopedic Spinal Surgeon. R. 452, 458. Relatedly, plaintiff did not procure an opinion from Dr. Hwang, who was also the orthopedic specialist and who therefore would have been the most qualified treating physician to render an opinion. In sum, plaintiff's argument about Dr. Nimmagadda's alleged lack of expertise overlooks these other reports.[3]

Plaintiff's main criticism of Dr. Nimmagadda's testimony is that it was supposedly "confusing" and "provided no clarity" and was "speculative." Plaintiff focuses on Dr. Nimmagadda's analysis of Listing 1.04(A).[4] However, the Court finds that this argument is unavailing for several reasons. First, at a basic level, the argument is hard to follow, and the

---

[3] Plaintiff tries to finesse this weakness in his argument by arguing that the ALJ "essentially" gave Dr. Nimmagadda's testimony "controlling" weight. Dkt. #12 at 8. But this attempt to pigeonhole the ALJ's ruling into a narrow framework is contradicted by the ALJ's statement that she was *not* giving controlling weight to Dr. Nimmagadda's opinion and by her statement that multiple consistent opinions supported the result. R. 30.

[4] This relevant portion of the listing provides as follows:

> **1.04 Disorders of the spine** (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral facture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A).

Court is not even sure it understands all of plaintiff's objections. Plaintiff presents the argument through a bullet-point list of eleven quotation snippets from the hearing. These quotations supposedly show that Dr. Nimmagadda inconsistently applied various technical terms, the prime example being that he made a distinction between "compression" and "compromise" of the nerve root. Although the Court is not entirely sure, it appears that plaintiff believes that there is not "really a difference" between these two terms. Dkt. #12 at 11. Plaintiff also states that the term "compromise" is not even a part of the listing. But in reading Listing 1.04(A), the Court notes that the lead-in paragraph includes the phrase "compromise of a nerve root" and then subsection (A) uses the phrase "nerve root compression." This would suggest that the listing itself makes a distinction between these two words. In short, based on reading the transcript, the Court does not find Dr. Nimmagadda's testimony to be confusing on this point.

In any event, even if his testimony were confusing on this point, or on other points, it is unclear why it matters in the end. All these points go to whether plaintiff could meet the listing, but as the Government argues in its response brief, plaintiff has not shown that he could meet *all* the particular requirements in Listing 1.04(A). *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of the criteria in the Listing in order to receive an award of disability benefits [] under step three."). Specifically, the Government states that plaintiff has not shown, among other things, that his doctors made any findings that he had atrophy or muscle loss, weakness, diminished reflexes, or a positive straight leg test. Dkt. #17 at 7. In his reply brief, plaintiff does not respond to these arguments and thereby implicitly concedes that he cannot meet this listing regardless of how clear or confusing Dr. Nimmagadda's testimony was. Thus, all the effort that plaintiff spent in his opening brief trying to show that Dr. Nimmagadda's testimony was *unclear* (note, plaintiff did not argue that the testimony was even affirmatively

5

*wrong*) was not for the purpose of showing that he met a listing but was merely an indirect attack on the RFC finding. For all the above reasons, the Court does not find that the ALJ erred in relying on Dr. Nimmagadda's testimony as one piece of evidence among many others.

**II.     Dr. Rivera's Opinion.**

In some ways, plaintiff's second argument is the flip-side of the one above and thus suffers from some of the same problems. In a short handwritten note written the day before the hearing, Dr. Rivera stated that plaintiff had the following limitations: "Sit or stand no more than 10 minutes at a time. Walk no more than 80 yards without rest. No lifting more than 5 lbs. No bending."[5] R. 461. Plaintiff argues that this opinion should have been given controlling weight under the treating physician rule.

> The ALJ provided the following explanation for giving this opinion only little weight:
>
> This opinion is also given little weight as these limitations are not supported by the objective evidence of record. Additionally, these assigned limitations are not supported by any physical examinations at the time the opinion was given. The last physical examination reflected in Dr. Rivera's records on 10/27/14 notes that the claimant had "baseline" tenderness, a normal straight leg raise test, no foot drop, normal strength, was able to cross his leg and was ambulating without any note of [a] problem (Ex 7F16). On March 18, 2015 Dr. Rivera noted that the claimant's pain was controlled and he was doing well on his current regimen (Ex 7F10) Despite the physical restrictions proffered by the doctor in December 2014 and the claimant's pain reports, the doctor notes that the claimant is not seeing an orthopedic specialist, nor a pain management specialist nor has he been to the emergency room. Moreover, Dr. Rivera's opinion is inconsistent with all of the other examining and specialist medical opinions, which do not support such extreme functional limitations.

R. 30.

In his opening brief, plaintiff provided the following explanation for why the ALJ's rationales were flawed:

---

[5] There was an earlier, vaguer opinion in Dr. Rivera's treatment notes from July 20, 2015, which stated that plaintiff was unable to return to his prior job because he could not "lift heavy objects" or "sit for [a] long period." Plaintiff does not focus his argument on this opinion.

> Here, Dr. Rivera had been treating plaintiff since as early as 2012. In fact, plaintiff went to Dr. Rivera to treat the initial work injury. It was Dr. Rivera that referred plaintiff to Midwest Orthopedic Institute for the spinal surgery evaluation. And, Dr. Rivera's opinion regarding plaintiff's restrictions was issued after the 2015 MRI showed a worsening of the condition (i.e. worsening disc extrusion at L4/5 which caused displacement of the left L5 nerve root). Dr. Rivera was more qualified to comment on plaintiff's limitations than Dr. Nimmagadda, a pediatric pulmonologist. Additionally, Dr. Rivera's opinion was consistent with Dr. Fischer's assessment that plaintiff could not lift weight repetitively. The ALJ should have considered these facts.

Dkt. #12 at 10 (citations omitted).

Plaintiff's argument suffers from the simple fact that he ignores most of the rationales cited by the ALJ. Specifically, plaintiff does not offer any response to the ALJ's assertion that Dr. Rivera had not examined plaintiff in over a year before he wrote the opinion; that his last examination showed mostly normal findings including that plaintiff was "ambulating without any note of [a] problem"; that Dr. Rivera elsewhere remarked that plaintiff's pain was "controlled" and that he was "doing well on his current regimen"; and that plaintiff was not seeing an orthopedic specialist or pain management doctor. Most significantly, plaintiff has once again overlooked the ALJ's key finding that Dr. Rivera's opinion was "inconsistent with *all* of the other examining and specialist medical opinions." Other than noting that Dr. Rivera's opinion was consistent with one limited aspect of Dr. Fisher's opinion (relating to bending), plaintiff has not challenged the broader conclusion that the ALJ, in effect, found that Dr. Rivera's opinion was the outlier. Consistency is a central principle embodied in the treating physician rule, and the ALJ's decision relies heavily on the finding that Dr. Rivera's opinion was inconsistent with these other opinions. For these reasons, plaintiff's attempt to cast Dr. Nimmagadda, rather than Dr. Rivera, as the outlier is not supported by substantial evidence.[6]

---

[6] The ALJ relied on these other medical reports both for the finding that the objective evidence showed only mild problems and the finding that the treatment recommendations were conservative but also, in some cases, for the larger conclusion that plaintiff was able to work. Given that plaintiff did not address most of this evidence, the Court

7

**III.   The 2015 MRI.**

Plaintiff's final argument is that the ALJ ignored the 2015 MRI, which supposedly supported plaintiff's claim that his condition was worsening. Plaintiff argues that even Dr. Nimmagadda acknowledged that this MRI showed "some worsening" of plaintiff's back condition. Dkt. #12 at 12. Plaintiff also argues that Dr. Rivera noted at one visit in 2015 that plaintiff had symptoms of claudication. *See* R. 421 ("Left foot starting to tingle, having symptoms of neurogenic claudication.").[7]

The Court finds that the ALJ reasonably concluded that this late-emerging evidence did not substantially change the earlier conclusions.[8] Contrary to plaintiff's suggestion, the ALJ did not completely ignore the 2015 MRI. *See* R. 26 (ALJ: "Most recently, an MRI of his lumbar spine taken on November 24, 2015, revealed only a mild progression of degenerative disc disease at L4-L5 and L5-S1; and multi-level disk bulging at L2-L3 and L3-L4, without significant mass effect or narrowing of the central spinal canal (Ex. 11F, 1)."). Although not mentioned in the decision, the ALJ was clearly relying on Dr. Nimmagadda's testimony that the 2015 MRI showed only a "little bit of a progression involved at L5-S1"; that this progression was not significant and was "very similar to the previous MRI"; and that some "mild progression [was] to be expected." R. 68. Plaintiff has not offered evidence to establish that these conclusions were erroneous. As for the one reference to claudication, there is little information in

---

need not summarize it in detail here, but will note a few highlights. Dr. Fisher, for example, noted that plaintiff had a full range of motion in his spine; that he had full strength, sensation, and reflexes in his lower extremities; and that he had a negative straight leg test. R. 448. He recommended that plaintiff try physical therapy and then, if that did not work, a steroid injection. R 450. Dr. Lami made similar findings and stated that plaintiff should have no restrictions in working. Ex. 10F. Dr. Ramchandani noted that plaintiff had a normal gait and a number of other normal findings. R. 377. Additionally, the two State Agency opinions provided general support for the ALJ's findings.

[7] According to the Mayo Clinic website, claudication is "pain caused by too little blood flow, usually during exercise" and is most often "a symptom of peripheral artery disease." The website also states that smoking and obesity, among other things, are risk factors and, therefore, advocates quitting smoking and maintaining a healthy weight as ways to prevent claudication.

[8] It is worth noting that plaintiff's counsel submitted a pre-hearing letter brief summarizing the key pieces of evidence, and did not mention the 2015 MRI. *See* Ex. 13E.

the record as to why Dr. Rivera, in this one visit, made such a finding. Nor is there an explanation for why this one finding would change all the earlier conclusions. In considering plaintiff's argument about the 2015 MRI, it is important to remember that his testimony was that he had a "drastic turn" six weeks before the hearing and that his condition was so bad that he was only able to crawl around on the floor during that time. R. 58. However, the ALJ found this story to be not credible because plaintiff did not contact Dr. Rivera nor visit the emergency room. R. 31. Although plaintiff stated that he saw a chiropractor, the ALJ noted that there was no documentation to support this claim. The Court finds that the ALJ, in relying on Dr. Nimmagadda's testimony and MRI report itself, could have reasonably found that any worsening was mild and specifically that it was at odds with plaintiff's testimony about a sudden and significant downturn in his condition.

This points to another larger problem with plaintiff's arguments. He has not challenged the ALJ's credibility finding in any respect, and has therefore waived any arguments relating to that portion of the decision. In this Court's experience, the credibility portion is often the most important part of a case involving back pain. In sum, the Court finds that, although plaintiff has raised some reasonable counter-arguments about how the evidence could be construed, the Court cannot find that the ALJ committed any error, nor ignored any line of evidence, and that this Court therefore is not in a position to re-weigh the evidence or second-guess the ALJ's decision. *See Johnson v. Berryhill*, Case No. 17-1696, at p.6 (7th Cir. Aug. 14, 2018) ("Resolving the conflicting evidence about such a close case, in which subjective pain is so critical, is a job for the ALJ in the first instance.").

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied; the government's motion is granted; and the decision of the ALJ is affirmed.

Date: August 23, 2018  By: _____
Iain D. Johnston
United States Magistrate Judge